UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| KEVIN ALAN LICHTMAN, | ) | Case No.  6:04-bk-02303-KSJ |
| ROCIO MONICA LICHTMAN, | ) | Chapter 7 |
| | ) | |
| Debtors. | ) | |
| | ) | |
| | | |
| PRIME EQUITY FUND, LP., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Adversary No. 6:04-ap-235 |
| vs. | ) | |
| | ) | |
| KEVIN ALAN LICHTMAN, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

MEMORANDUM OPINION ON COMPLAINT TO DETERMINE
DISCHARGEABILITY OF DEBT PURSUANT TO 11 U.S.C. § 523(A)(19)

The plaintiffs[1] are a group of investors who purchased shares in a company called

FinancialWeb.Com, Inc. ("FinancialWeb").   The debtor/defendant, Kevin Alan Lichtman,

founded FinancialWeb with the help of his friend, Jack Cabasso. When the start-up company

failed, the plaintiffs blamed Litchtman, at least in part, for their losses and now contend that any

debt due to them by the debtor is not dischargeable pursuant to Bankruptcy Code[2] Section

523(a)(19). The plaintiffs assert claims[3] of common law fraud and negligent misrepresentation

---

[1] The plaintiffs remaining in this adversary proceeding are Prime Equity Fund, L.P., Joan C. Andric, Harry Jack Ashkenazie, Robin Greely, in her capacity as executrix of the estate of Wilfred Cardoni, J & J Financial Services, Inc., John J. Katsock, Jr., in his individual capacity and on behalf of his minor children, Kristin Katsock and Katlyn Katsock, John J. Katsock, Sr., in his individual capacity and as Trustee of the Chauncey Meyer Trust and the Jennie Cardoni Trust, Richard Katsock, Pinnacle, a Delaware Corporation, Pinnacle One, Inc., Michael Rosenblatt, Solebury Investment Corp., Wyoming Valley Drilling & Blasting Company, Avrohom Moshel, and Keith Maltby.

[2] Unless otherwise stated, all references to the Bankruptcy Code herein refer to Title 11 of the United States Code.

[3] The plaintiffs' claims against Lichtman are not yet reduced to judgment and arise from a lawsuit plaintiffs filed against Lichtman and others in Prime Equity Fund, LP., et. al. v. Cabasso, et.al., No. 04-5684 CACE (02) (17th Cir. Ct. Broward Co., Fla.) (the "Broward Case") on April 4, 2004.  Because Lichtman already had filed this bankruptcy case approximately one month earlier, on March 3, 2004, the Broward Case was quickly stayed as to Lichtman.

arguing that Lichtman did not inform them of Cabasso's role as a founder/promoter of FinancialWeb, of Cabasso's prior criminal convictions, or of Cabasso's personal bankruptcy case. If Litchtman had disclosed these facts, the plaintiffs argue that they would never have purchased FinancialWeb stock or lost their money. In response, Lichtman, representing himself *pro se*, maintains he fully disclosed Cabasso's involvement in FinancialWeb and did not learn of Cabasso's criminal/bankruptcy history until after he was ousted from FinancialWeb.

Between 1991 and 1997, Lichtman, a stock broker with a Series 7 license, worked in the emerging "dot.com" industry researching stocks advertised for sale on the internet. He focused on small capital stocks, also known as "penny stocks." Lichtman first met Cabasso during this period. Lichtman was working at Continental Capital & Equity, Inc., when Cabasso sought Continental's assistance in promoting another business. Lichtman and Cabasso became friends.

Eventually, Lichtman left Continental[4] to start his own company to design, develop, purchase, and manage internet-based business publications, providing a wide range of frequently updated, high quality financial information on user-friendly web sites. (Defendant's Exh. No. 4, p. 9). Lichtman discussed his ideas with Cabasso, who agreed to help find investors and to raise start-up capital. Lichtman focused on managing the new company and expanding its internet presence.[5]

---

[4] Lichtman believed that Continental was operating a "pump and dump" business. In this scheme, sellers/stock promoters artificially inflate, or "pump up," the price of a stock through false and misleading positive statements to induce unsuspecting buyers to buy shares. The sellers sell then "dump" these overvalued shares, the price falls, and innocent investors lose their money. The stock promoters earn large amounts of monies while the investors correspondingly lose their investment.

[5] FinancialWeb's home page served primarily as an information billboard and a directory of links visitors could select to navigate to other FinancialWeb research sites. (Plaintiffs' Exh. No. 312, p.4). FinancialWeb had multiple websites providing information and research tools on stocks, including The SmallCap Investor (www.smallcapinvestor.com), Quote Central (www.quotecentral.com), Stock Detective (www.stockdetective.com), Wall Street Guru (www.wallstreetguru.com), and StockTools (www.stocktools.com).

Their initial efforts bore fruit. In February 1997, Lichtman and Cabasso founded FinancialWeb[6] via a reverse merger[7] into a public shell entity Cabasso located. (Plaintiffs' Exh. No. 301, Sub-Exh. A). Lichtman and Cabasso worked together to get FinancialWeb up and running. Lichtman was named as FinancialWeb's Chairman of the Board and President.  He managed FinancialWeb's daily operations, website content, and product development. Cabasso held no formal position with the company and was not directly identified in any of the corporate documents or in any of FinancialWeb's early public filings.[8]  The Court assumes for the purpose of this ruling that Cabasso, who actively assisted Lichtman in starting FinancialWeb, was a promoter or control person, as those terms are contemplated in securities law.[9]

---

[6] The details concerning FinancialWeb's creation are described in a FinancialWeb SEC filing, dated November 11, 1999:

> The Company was incorporated on May 16, 1983, in the State of Utah under the name of Vital Technologies, Inc., and then re-domiciled itself in Nevada in 1988. The Company was inactive from 1991 through 1996. On March 3, 1997, the Company changed its name to Axxess, Inc., reverse split the issued and outstanding shares in a one for twenty-five transaction, changed directors and entered the business of multimedia publishing and communications. On January 4, 1999 the Company adopted its current name [FinancialWeb.com] in order to more accurately reflect its core business. (Defendant's Exh. No. 4, p.9).

[7] Specifically, on February 14, 1997, the directors of the shell company, Peppermint Park Productions, Inc., executed an agreement pursuant to which they turned over the corporate shell to Lichtman in exchange for a small number of shares in the merged/reorganized entity. (Defendant's Exh. No. 4, p.9). Lichtman estimates that approximately 80,000 free trading shares were given to the predecessor shareholders in exchange for Peppermint, representing less than five percent of the total number of successor shares. The agreement became effective as of March 3, 1997. (Plaintiffs' Exh. No. 301, Sub-Exh. A and B).

[8] Cabasso may later have been identified as a promoter and shareholder of FinancialWeb in a restated financial statement in a Form 10-K the company filed in the summer of 2000, after Lichtman already had left the company. (See Doc. No. 1, Exhibit A, First Amended Complaint in Broward Case, p. 26, ¶¶ 116 – 118).

[9] Title 17 of the Code of Federal Regulations pertains to Commodity and Securities Exchanges. The terms "promoter" and "control" are defined therein:

> The term "promoter" includes:

> (i) Any person who, acting alone or in conjunction with one or more other persons, directly or indirectly takes initiative in founding and organizing the business or enterprise of an issuer; or

> (ii) Any person who, in connection with the founding and organizing of the business or enterprise of an issuer, directly or indirectly receives in consideration of services or property, or both services and property, 10 percent or more of any class of securities of the issuer or 10 percent or more of the proceeds from the sale of any class of such securities. However, a person who receives such securities or proceeds either solely as underwriting commissions or solely in consideration of property shall not be deemed a promoter within the meaning of this paragraph if such person does not otherwise take part in founding and organizing the enterprise.

From its inception in March 1997, FinancialWeb lost money. Revenues never funded its operations. Rather, various investors, starting with Cabasso or his affiliated entities, infused millions of dollars of equity capital in exchange for stock on the hope the company eventually would succeed. However, like many other incipient dot.com businesses, FinancialWeb failed in June 2000.

Cabasso orchestrated the first wave of investment monies infused into FinancialWeb. Cabasso acted as FinancialWeb's management and financial consultant through an entity called Alcott Simpson ("Alcott"). (Plaintiffs' Exh. 301, Sub-Exh. E and H). Through Alcott, Cabasso actively sought investment capital for FinancialWeb. In exchange for these efforts, Alcott and FinancialWeb executed an agreement under which Alcott would receive $10,000 per month and a number of shares in FinancialWeb. (Plaintiffs' Exh. 301, Sub-Exh. E). Alcott agreed to let these monthly payments accrue and assigned its FinancialWeb shares to two offshore entities— Classic International Holdings ("Classic") and Stewart International ("Stewart"). Cabasso likely had an ownership interest in Alcott, Classic, and Stewart. Therefore, Cabasso may have indirectly invested the initial start-up monies and held an indirect interest in the FinancialWeb shares later acquired by Classic and Stewart.

FinancialWeb initially issued approximately two million restricted shares. Lichtman received 1,850,000 of these initial shares,[10] approximately 92.5 percent, but, in July 1997, Lichtman orally agreed to split his shares with Cabasso or with Cabasso's designees (the "Oral

---

The definition of "control" provides as follows:

The term "control" (including the terms "controlling," "controlled by" and "under common control with") means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.

17 C.F.R. § 240.12b-2.

[10] The remaining 150,000 shares were issued to John H. Burmeister, the incoming Vice President, Secretary, and a director of the company (139,000 shares), to Jeffrey Grossman, another incoming Vice President and a Director (10,000 shares), and to Gene Hemiki (1,000 shares). At this point, all of these shares were restricted, which prevented their sale. (Plaintiffs' Exh. No. 301, Sub-Exh. A).

Agreement") in exchange for Cabasso's and Alcott's services. Lichtman testified that Cabasso deserved to receive half of the initial founder's shares because he took the risk in raising capital to start FinancialWeb.

The Oral Agreement was never reduced to writing. According to Lichtman, this was because, at inception, FinancialWeb was little more than an empty corporate shell and a business idea. In Lichtman's words, "half of nothing is still nothing," so it simply was not necessary to formalize the Oral Agreement in a writing.

Cabasso was effective in raising capital for FinancialWeb, investing at least $300,000 via three offshore entities: Rock Company ("Rock"),[11] Stewart,[12] and Classic (collectively, the "Offshore Entities").[13] (Plaintiffs' Exh. No. 301, Sub-Exh. H) (March 27, 1997, fax from Lichtman instructing that 100,000 shares be issued to each of the Offshore Entities); (Plaintiffs' Exhibit 301, Sub-Exh. F) (Lichtman's agreement with Michael Macey, a banker in the Channel Islands, to issue these shares).   Although the evidence is sparse, in all likelihood, Cabasso owned or had an ownership interest in the Offshore Entities. Cabasso was deposed in connection with this adversary proceeding, but, on the advice of counsel, declined to answer any questions regarding FinancialWeb, Alcott, Rock, Stewart, and Classic, asserting his Fifth Amendment privilege, because of charges pending against him in the New York County District Attorney's office. (Doc. No. 141, Deposition 1 – Jack Cabasso – December 2, 2002).  However, in at least one documented instance, mail was addressed to Rock, "care of Jack Cabasso, sole shareholder." (Doc. No. 150, Deposition 8 - Scott Wilson – December 18, 2002, p. 98 l. 1-12). In other

---

[11] Between June 12, 1997, and November 6, 1997, FinancialWeb received $125,000 from Rock. (Plaintiffs' Exh. No. 321). In December of 1998, 100,000 shares of Common Stock were issued to Rock in full settlement of $292,367.12 of debt. (Defendant's Exh. No. 8).

[12] On March 17, 1997, FinancialWeb received $50,000 from Stewart. (Plaintiffs' Exh. No. 321).

[13] Alcott, Classic and Rock were formed in the Channel Islands.  Stewart was organized under the laws of the British Virgin Islands. (Plaintiffs' Exh. 301, Sub-Exh. E and H).

correspondence, Rock and Cabasso were discussed interchangeably. (Doc. No. 150, Deposition 8 - Scott Wilson – December 18, 2002, p. 125 l. 20, p. 126 l. 1-13).

Cabasso also was effective in attracting new, unaffiliated investors. Cabasso convinced both Matt Schilowitz and Glenn Laken to invest substantial capital in FinancialWeb.  Schilowitz entered into a consulting relationship with FinancialWeb to provide services very similar to those Cabasso was rendering through Alcott. Shilowitz also invested in FinancialWeb through two business entities—the Harmat Organization, Inc. ("Harmat") and Masada I, L.P. ("Masada"). Laken, an experienced commodities trader and money manager from Chicago, also invested in FinancialWeb, contributing approximately $400,000 in August 1998.

Cabasso lastly located an accountant, Jere Lane,[14] who Lichtman later hired as FinancialWeb's outside accountant. Lane prepared audits of FinancialWeb for 1997 and 1998. Lane also may have assisted the accounting firm of Deloitte and Touche when the firm was later retained to prepare FinancialWeb's eventual filings with the Securities and Exchange Commission.

By late 1998, however, the fund raising efforts of Cabasso, Shilowitz, and Laken were not enough.  FinancialWeb was experiencing severe cash problems. Lichtman withheld his own salary, juggled bills, and feared FinancialWeb would close. FinancialWeb was scrambling for investors and entered into yet another agreement with an investment bank, First American Investment Banking Corporation ("First American"), to raise capital.  First American was owned, in part, by Frank Musolino, who personally invested $500,000 in FinancialWeb in exchange for one million shares of stock. First American and Musolino were represented in the transaction with FinancialWeb by Peter Peterson ("Peterson"), who performed a due diligence examination of FinancialWeb.  In the course of this review, in December 1998, Peterson learned

---

[14] At the time of trial, Lane was not a currently licensed Certified Public Accountant.

of the Oral Agreement between Lichtman and Cabasso.  (Doc. No. 136, p. 127, l. 16 through p. 128, l. 21).  Lichtman made no effort to conceal the terms or existence of the Oral Agreement.

Laken, by September 1998, also brought a new investor to FinancialWeb—John Katsock Jr. (Doc. No. 135, pp. 41-42). Katsock, the spokesperson for the plaintiffs in this adversary proceeding, is a sophisticated businessman with a Series 7 license and experience in the securities trading industry. He was the managing director of a family-owned brokerage business trading in securities, stocks, bonds, future funds, and options, called Pinnacle Asset Management, Inc. ("Pinnacle").  (Doc. No. 135, pp. 37-38). Pinnacle, in turn, had approximately 1,000 to 1,500 retail brokerage customers and annual gross revenue of approximately $4 to $6 million.  Katsock was the person who encouraged his customers, mostly relatives or friends of Katsock or their affiliated companies, to purchase FinancialWeb's stock.  (Doc. No. 135, pp. 39-40).  The plaintiffs are customers of Pinnacle who bought FinancialWeb shares on Katsock's advice and recommendation.  Katsock purchased his first shares of FinancialWeb for himself or Pinnacle's clients in September 1998. (Plaintiffs' Exh. No. 314).[15]

*After* Katsock and his clients bought stock in FinancialWeb, Katsock and Lichtman spoke for the first time by telephone in late 1998 and met for the first time in January 1999, when they, along with Cabasso, Shilowitz, Laken, and James Gagel, who served as FinancialWeb's legal counsel, met at FinancialWeb's offices in Florida, for an in-depth, two-day business meeting. The meeting focused on FinancialWeb's business and its future plans.  At the meeting, Lichtman gave Katsock general information about FinancialWeb as well as copies of FinancialWeb's unaudited balance sheets for 1997 through September 1998, prepared by Lane. (Plaintiffs' Exh. Nos. 311 and 312; Doc. No. 135, p.45). Lane expressly qualified the financial statements by stating that they were "substantially less in scope than an audit in accordance with generally

---

[15] Bear Stearns acted as the clearing firm for all of Pinnacle's transactions, processing trades, producing statements, and complying with regulatory items.  Bear Stearns prepared Exhibit No. 314 that lists the investments in FinancialWeb by Pinnacle's clients.

accepted auditing standards, the objective of which is the expression of an opinion regarding the financial statements taken as a whole." The financial information was presented as a preliminary assessment of the company's financial condition as of September 1998.

Lichtman also provided Katsock with FinancialWeb's "Confidential Business Plan," which described FinancialWeb's corporate history, the business of FinancialWeb, and its competition. (Plaintiffs' Exh. No. 312, pp. 1-11). The plan explained that, as of January 15, 1999, FinancialWeb may "be unable to continue as a going concern" because the company "had incurred net losses since inception and had an accumulated deficit of $1,219,424 at September 30, 1998." Additionally, the business plan provided that FinancialWeb's "continuation as a going concern is dependent upon its ability to generate sufficient cash flow to meet its obligations on a timely basis, continued financial support from its stockholders, and ultimately the attainment of successful operations." (Plaintiffs' Exh. No. 312, p. 13). Neither the financial statements nor the business plan disclosed the names of FinancialWeb's employees, shareholders, officers, or directors.

Based on this information, by January 1999, Katsock knew that FinancialWeb was on the precipice of failure unless substantial new equity was infused. After the January meeting, none of the meeting attendees could reasonably believe that FinancialWeb was an established business with a successful operating history. FinancialWeb accurately was depicted as a new startup with its existence dependent upon continued cash infusions from investors. FinancialWeb was a high-risk, speculative investment in January 1999, and continued in that vein until it failed in June 2000.

The recollections of Katsock and Lichtman diverge as to other information orally discussed at the meeting in January 1999. Katsock testified that Cabasso was introduced as a person performing some accounting functions for FinancialWeb and not as a direct or indirect shareholder of FinancialWeb. Katsock further stated that neither the Oral Agreement nor any

information regarding Cabasso's criminal record or personal bankruptcy case was disclosed. (Doc. No. 137, p.102). In addition, Katsock claims he specifically asked Lichtman about the backgrounds of the key people associated with FinancialWeb and that Lichtman responded stating that "everybody was clean." (Doc. No. 135, p. 46). Katsock also claims that Lichtman offered to obtain background information on FinancialWeb's important personnel but that he never followed through with his offer. (Doc. No. 135, p. 46-47). According to Katsock, if he had known Cabasso had a criminal background, he never would have recommended FinancialWeb securities to his customers. (Doc. No. 135, p. 57).

Lichtman, conversely, claims he candidly explained how FinancialWeb relied on equity capital to stay in business, which is supported by the written Business Plan. Lichtman testified that he specifically told Katsock about his Oral Agreement to share 50 percent of his founder's shares with Cabasso and also generally identified investors, such as Musolino, Shilowitz, or their companies, that held FinancialWeb's outstanding shares. One point Katsock and Lichtman do agree on, however, is that Cabasso's criminal history and personal bankruptcy filing were not discussed at the January 1999 meeting; Lichtman steadfastly maintains he was completely unaware of this information at that time. Additionally, Lichtman maintains that Katsock did not ask for any background checks on anyone associated with FinancialWeb.

The Court accepts Lichtman's version of the information shared at this important meeting. Lichtman testified in a credible and truthful fashion, often offering testimony contrary to his best interests, whereas the Court would find Katsock's testimony contradictory, self-serving, and less than credible. Notably, Katsock was the only person having a professional relationship with FinancialWeb claiming to be completely in the dark about Cabasso's level of involvement with FinancialWeb or the Oral Agreement. For example, one FinancialWeb employee, Carl Surran, who administered FinancialWeb's website content, testified that he learned Cabasso was one of FinancialWeb's significant financial backers soon after coming to

work for FinancialWeb in July 1997.  (Doc. No. 136, p. 17).  Peterson, who helped Musolino

acquire one million shares of FinancialWeb stock, was aware of the Oral Agreement by

December 1998.  Gagel, who served as FinancialWeb's legal counsel for between one and two

years in addition to serving on the board and as FinancialWeb's CEO for a short time, recalled

learning of the Oral Agreement when Lichtman explained it to an outside accounting firm,

Deloitte and Touche.[16] (Doc. No. 137, p. 10). Gagle testified that the Oral Agreement "wasn't

any secret and didn't smack of anything improper. . . ". (Doc. No. 143, Deposition 6 – James

Gagel – January 6, 2003, p. 41, l.17 through p.42, l. 25). Thus, the Court would specifically find

that Lichtman did not conceal the existence of his Oral Agreement with Cabasso and that he

disclosed the true nature of Cabasso's role as a founder/promoter in FinancialWeb to Katsock in

January 1999.

Katsock's recollection of events appeared very selective.  For example, he stated that he

requested background reports on key persons associated with FinancialWeb, including Cabasso.

If, as Katsock claims, Cabasso was introduced to him not as a key person but as someone

performing administrative accounting functions for FinancialWeb, why would Katsock have

asked for a background report on him?  The Court simply does not accept Katsock's testimony

that he asked for any background checks of Cabasso, or for that matter, anyone else.  Katsock

certainly did not produce a single letter or e-mail following up on his alleged request for

background information.  Katsock simply wants this Court to excuse his failure to perform

reasonable due diligence and to shift the blame to Lichtman and others named in the Broward

Case.

Katsock's testimony also was inconsistent.  Initially, he testified Lichtman did not

explain the terms of Musolino's investment in FinancialWeb.  Yet, on rebuttal testimony, his

---

[16] Deloitte and Touche was contacted early in FinancialWeb's history to do some accounting work, but declined, and then was later retained by FinancialWeb to perform an audit, in July, 1999. (Doc. No. 137, p. 12) (Gagel's testimony); (Doc. No. 146, Deposition 7 - Patrick Thomson – December 18, 2002, p. 12 l. 23 though p. 13 l. 3).

story changed entirely.  Upon further questioning, he stated he actually met with Musolino during the January 1999 meeting to discuss the exact nature of his investment.  Peterson confirmed that this side meeting between Katsock and Musolino occurred and was uncomfortably adversarial, at best.

After this meeting in January 1999, Katsock became actively involved in the management of FinancialWeb.  Cabasso, correspondingly, relinquished any vestige of active control he may ever have had in the company.  Pursuant to the terms of the Oral Agreement, in February 1999, Cabasso directed Lichtman to transfer his portion of the founder's shares of FinancialWeb to his designated entities, Hampton Venture Capital I, L.P. and Web Venture Capital, Inc., but otherwise withdrew from any further management or fund-raising tasks on behalf of FinancialWeb.

Katsock, however, became more and more intertwined with FinancialWeb. On March 10, 1999, Katsock entered into a consulting agreement with FinancialWeb and actively embarked upon a quest to find investors and to raise capital. (Defendant's Exh. No. 8; Plaintiffs' Exh. No. 313). He worked to locate an investment banker, raise funds, find key personnel, and build other strategic relationships for the company. Katsock's Pinnacle clients continued to invest in FinancialWeb in increasing amounts.  He sold FinancialWeb stock to over 100 clients. (Plaintiffs' Exh. No. 314) (Doc. No. 137, p.109).  The Court finds it incredible that Katsock was "in the dark" about any substantial aspect of FinancialWeb's ownership, principals, or business.

Katsock worked hard on FinancialWeb's behalf.  He introduced Allen & Company ("Allen"), a prominent investment banking firm in New York, to FinancialWeb,[17] and Allen agreed to become FinancialWeb's exclusive financial advisor. Katsock sponsored at least two

---

[17] On March 31, 1999, FinancialWeb signed an engagement letter with Allen providing that Allen would be its exclusive financial advisor. Under FinancialWeb's agreement with Allen, Allen was to receive warrants to purchase 979,321 shares of Common Stock at $4.00 per share. (Defendant's Exh. No. 8).

private placements, one of which resulted in FinancialWeb collecting $2 million, for which Pinnacle received a commission of approximately seven percent.

Katsock, with Laken's support, also was responsible for ousting Lichtman from the company he founded.  Apparently Katsock believed that Lichtman was not the right person to take FinancialWeb to the next level. Lichtman had experience researching and writing about stocks. He was not an expert in managing a public company. Lichtman was informally removed from any day-to-day management of FinancialWeb and had stopped coming to the office by September 1999.  Lichtman formally resigned on October 22, 1999, after he negotiated an agreement with FinancialWeb to repurchase approximately 95 percent of his shares.

In the interim, Katsock, with Laken's help, actively started looking for a new CEO to replace Lichtman.  Katsock gained control of FinancialWeb's board by recruiting a sophisticated and professional board of directors for the company, including John Bergen, a former Director of Communications for CBS, and Martin Averbach, who worked for both the International Securities Exchange and with E*TRADE Group, Inc. (Defendant's Exh. No. 7, p. 5).

After Lichtman's ouster, FinancialWeb still struggled to complete the development of its web publications and to become a fully reporting public company with the SEC trading on the NASDAQ.[18] In order to get FinancialWeb trading on NASDAQ, FinancialWeb needed audited financial statements completed by a high caliber accounting firm. To that end, FinancialWeb retained the accounting firm of Deloitte and Touche in July 1999.[19]

Although Deloitte and Touche quickly finished its auditing field work, the firm stopped work on the audit in September 1999 because the accounting firm could not unravel FinancialWeb's complex equity transactions. (Doc. No. 146, Deposition 7 - Patrick Thomson –

---

[18] Completing the SEC filings was particularly costly. FinancialWeb's legal bills amassed in large part in connection with preparing the SEC filing topped $200,000. The company retained well-qualified but very expensive lawyers and accountants.

[19] FinancialWeb and Deloitte and Touche entered into an engagement letter on July 21, 1999. (Doc. No. 146, Deposition 7 - Patrick Thomson – December 18, 2002, p. 12 l. 23 though p. 13 l. 3).

December 18, 2002, p. 32, l. 12). Patrick Thomson, Deloitte's primary accountant working on FinancialWeb's audit, had questions relating to the Oral Agreement between Cabasso and Lichtman and whether some of FinancialWeb's other equity holders were considered "control persons" under SEC regulations. (Doc. No. 146, Deposition 7 - Patrick Thomson – December 18, 2002, p. 49, l.6 through p. 53, l.4).

Gagle, who was running FinancialWeb after Lichtman's departure, was Thomson's primary contact at FinancialWeb. (Doc. No. 146, Deposition 7 - Patrick Thomson – December 18, 2002, p. 13, l.4-8).  Gagle, overwhelmed by his newly expanded responsibilities, initially ignored or provided only vague responses to Thomson's request for information regarding Alcott, Stewart, and Harmat. (Doc. No. 146, Deposition 7 - Patrick Thomson – December 18, 2002, p. 49, l.6 through p. 53, l.4). Deloitte accountants also contacted Lichtman who was unable to provide the detailed information they needed. (Doc. No. 146, Deposition 7 - Patrick Thomson – December 18, 2002, p. 68, l.4-6). The accountants attributed Gagle's and Lichtman's inadequate responses more to disorganization than any deliberate or intentional withholding of information. (Doc. No. 150, Deposition 8 - Scott Wilson – December 18, 2002, p. 20, l. 2-13, and p. 40, l.1-24). Because Deloitte and Touche needed answers to their questions regarding FinancialWeb's equity transactions and because the company could not supply the answers, the law firm of Pepper Hamilton was retained to investigate FinancialWeb's equity owners.

As Pepper Hamilton started their work, a significant new development increased the urgency to conduct a background investigation. On September 29, 1999, the State of New York issued a subpoena *duces tecum* to FinancialWeb commanding Lichtman, as the company's titular leader, to appear before the Grand Jury on October 15, 1999, in a criminal proceeding styled as "People of the State of New York against John Doe" and to bring with him:

> Any and all documents that refer, reflect, concern, or relate to the following:
> Jack Cabasso; Frances Gluck, Frances Cabasso; Stuart Gluck, David Gluck,
> Estelle Gluck, Clive "Lefty" Smith; Michael Massy; John Katsock; Glenn Laken;

Judy Wetzstein; Ryan Leeds; Michael Leeds; Frank Musolino; Peter Mergenthaler; Adam Schild; Hampton Venture Capital I, L.P., Butch, Inc., Chatham Capital, L.P.; Cacique Partners, L.P.; Web Venture Capital, Inc.; Alchemy Holdings, Inc.; Hawk Marine Power, Inc.; Cigarette Racing Team, Inc.; Environmental Consulting; Franchise Development Corporation; Brendon, Ltd.; Wythe Investments; Masada I., L.P.; Lakewood Group, Inc.; Lakewood Communications, Inc.; Meyers Pollock Robbins, Inc.; Western & Pacific Resources Corp.; Cellular Telecommunications (Telecom) & Technologies, Inc.; and/or Spa Faucet, Inc.

(Defendant's Exh. No. 28).   The document production subpoena listed several names of individuals associated with FinancialWeb, including Cabasso, Katsock, Laken, and Musolino, and their related companies, including Hampton Venture Capital I, L.P., Web Venture Capital, Inc., Masada I., L.P.  Given the number of insider names and the obvious underlying criminal investigation, shareholders obviously were quite distraught and encouraged Pepper Hamilton to expedite their work.  Lichtman, who was not actively running the company when the subpoena issued, testified that he learned of the subpoena shortly after its issuance and voluntarily worked with Gagle to gather the requested documents.

Katsock testified that he did not learn of the subpoena until much later even though he was specifically named as a target of the subpoena, along with Laken and Cabasso. It is highly implausible that Katsock was not immediately informed of the subpoena.   The Court specifically finds that Katsock was aware of the pending investigation involving himself and Cabasso as early as October 1999.

Yet, even after learning of the criminal investigation, Katsock continued to recommend that Pinnacle's customers buy FinancialWeb shares.  (Doc. No. 135, p. 103, l. 5- 15). In late 1999, Katsock negotiated an agreement on behalf of FinancialWeb with another investment banking firm—Rob Peck McCooey ("RPM"). (Doc. No. 135, p. 67). In order to pay the now ousted Lichtman for his shares, RPM, with Katsock's help, orchestrated a large private placement of stock in the first quarter of 2000 and sold approximately $6 million of FinancialWeb stock by April 2000, months after Katsock learned of the subpoena and criminal

allegations. Pinnacle's clients continued to voraciously purchase FinancialWeb shares well into 2000.  (Doc. No. 135, pp. 74-77).  The pending criminal investigation did not appear to slow Katsock's enthusiasm in selling FinancialWeb stock. (Defendant's Exh. No. 4). (Doc. No. 135, pp. 67, 74-77, 103).

Deloitte and Touche resumed their audit work in March, 2000.  Pepper Hamilton had completed the background investigation, and Cabasso's substantial criminal history finally was revealed.  Cabasso had been convicted of grand larceny in two separate and unrelated cases, jury tampering, violating probation, enterprise corruption, schemes to defraud investors, and had a Chapter 7 bankruptcy case pending during the early months while he was involved with FinancialWeb.[20] By March 2000, if not earlier, Cabasso's criminal history was fully disclosed to insiders at FinancialWeb, including Katsock. Notably, Wilson, one of Deloitte's accountants, recalled that "the people who [were] buying a private placement memo were certainly aware of Jack Cabasso or aware of a Jack Cabasso type individual." (Doc. No. 150, Deposition 8 - Scott Wilson – December 18, 2002, p. 144, l. 20-25).

Deloitte and Touche, however, believed Cabasso's criminal history did *not* have to be disclosed in the audit or SEC filings. (Doc. No. 146, Deposition 7 - Patrick Thomson – December 18, 2002, p. 77, l.1-8). Although the evidence does not contain any fully articulated reason for this decision, presumably Deloitte and Touche concluded that, because Cabasso was no longer involved with FinancialWeb's management, the disclosure was not needed.

---

[20] In 1982, Cabasso, who stole money and property from his Manhattan jeweler employer, was convicted of three counts of second degree grand larceny in New York County, New York (Doc. No. 1, ¶ 45), for which he was sentenced to a 60-day prison term and 5 years probation. (Plaintiffs' Exh. No. 303). Also in 1982, Cabasso stole two checks while he was operating an automobile leasing franchise, pled guilty, and was convicted of three counts of second degree grand larceny in Nassau County, New York (Doc. No. 1, ¶ 45), for which he was sentenced to a 60-day prison term and 5 years probation to be served concurrently with the sentence handed down from the New York County Court. (Plaintiffs' Exh. No. 304). Cabasso later pled guilty to violating probation in connection with the Nassau County Court sentence. (Plaintiffs' Exh. No. 304). In 1993, Cabasso pled guilty to a charge of jury tampering and was sentenced to a prison term of 21 months followed by 3 years of supervised release. (Plaintiffs' Exh. No. 308 and 309). On December 6, 1994, Cabasso filed a Chapter 7 bankruptcy petition, which case was still pending when Cabasso and Lichtman founded FinancialWeb. (Plaintiffs' Exh. No. 306). On March 14, 2000, Cabasso pled guilty to enterprise corruption and multiple counts of schemes to defraud investors and was sentenced to a prison term of between 16 months and 4 years. (Plaintiffs' Exh. No. 305).

Specifically, Wilson recalled a conversation with an attorney from Pepper Hamilton where he learned Cabasso was no longer involved with FinancialWeb as of approximately May 1999. (Doc. No. 150, Deposition 8 - Scott Wilson – December 18, 2002, p. 121, l.19).    Certainly, neither Lichtman nor Cabasso had any involvement in deciding not to include Cabasso's nefarious past in FinancialWeb's public disclosures.  Indeed, FinancialWeb's first SEC filing of any substance,[21] a Form 10Q, was completed on November 8, 1999, approximately one month after Lichtman had officially left FinancialWeb.

FinancialWeb's eventual demise, however, had little to do with Cabasso's past infractions but rather was due, in large part, to the fact that another insider, Glenn Laken, was criminally indicted on June 14, 2000 (Doc. No. 135, p. 74) in two criminal proceedings in the United States District Court for the Southern District of New York. (Plaintiffs' Exh. No. 346, p. 21, ¶¶ 93, 94, and 95). In one case, styled United States v. Laken, No. 00 Cr. 651 (S.D.N.Y), Laken was charged with securities and wire fraud for artificially inflating FinancialWeb stock so that he could profit from selling his shares in the company, and in the other case, styled United States v. Lino, No. 00 Cr. 632 (S.D.N.Y.), Laken was charged with conspiracy and defrauding union pension funds by causing them to invest in high risk investments and providing commission kickbacks to union officials. (Doc. No. 1, Exhibit A, Amended Complaint in Broward Case, p. 25, ¶115). Laken's indictments directly impacted the price of FinancialWeb stock.

When news of Laken's indictments became public, the value of FinancialWeb's stock plummeted. Even Katsock described Laken's indictments as the nail in FinancialWeb's coffin. (Doc. No. 135, p. 77).  Prior to the indictments, between March and June 1999, FinancialWeb's stock was trading at approximately $14 to $18 per share. From July 1999 to June 13, 2000, the closing price ranged from $5 to $8 per share. After news of Laken's indictments broke, on June

---

[21] Earlier, on April 16, 1999, FinancialWeb completed a Form 10ksb, simply listing the beneficial owners and management holding five percent or more of FinancialWeb's outstanding voting stock. (Defendant's Exh. No. 1).

14, 2000, the stock fell, tumbling to just $1.41, on June 30, 2000. (Defendant's Exh. No. 3, p. 4, and Exh. No. 12). Eventually, the value of FinancialWeb shares further declined, and the company failed.  Ever since, Katsock has sought to pin the responsibility for the losses ensuing to his brokerage clients on someone else.

After FinancialWeb collapsed, Katsock's brokerage firm, Pinnacle, also closed, later in 2000. (Doc. No. 135, p. 56).  In April 2002, Pinnacle's customers sued Katsock and others alleging Katsock committed fraud in the offer and sale of FinancialWeb securities, made an unsuitable stock recommendation, failed to execute sell orders for two customers, made improper price predictions, and interfered with a NASD investigation. The NASD eventually found that Katsock recklessly failed to inform his Pinnacle customers about the speculative nature of the FinancialWeb investment and made baseless price predictions regarding the stock. Ultimately, the NASD barred Katsock from associating with any NASD member firm in any capacity. (Defendant's Exh. No. 3). Katsock also was fined several hundreds of thousands of dollars for his actions.

In an attempt to recoup some of their lost investment monies, Katsock and Pinnacle's customers filed the Broward Case and this adversary proceeding against Lichtman alleging Lichtman committed common law securities fraud or negligent misrepresentations in the sale of securities and should not receive a discharge of the amounts he owes them[22] pursuant to Section

---

[22] In this case, the related state court case alleging securities fraud was not filed against Lichtman until after he filed this bankruptcy case.  Plaintiffs' claims against Lichtman, therefore, are not yet reduced to judgment. Prior to the enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), a claim that was not reduced to judgment before a debtor filed a bankruptcy petition arguably was ineligible for an exception to discharge under Section 523(a)(19). See In re Whitcomb, 303 B.R. 806 (Bankr. N.D. Ill. 2004); In re McClung, 304 B.R. 419 (Bankr. D. Idaho 2004); In re Gibbons, 289 B.R. 588 (Bankr. S.D. N.Y. 2003).  However, in 2005, Congress added the phrase, "before, on, or after the date on which the petition was filed," clarifying that a plaintiff whose claim had not been reduced to judgment may still seek an exception to discharge.

523(a)(19) of the Bankruptcy Code.[23] Specifically, plaintiffs allege Lichtman fraudulently or negligently misrepresented important facts by failing to disclose that Cabasso was a founder, promoter, or control person of FinancialWeb holding a significant equity interest and that Cabasso had a criminal history and a personal bankruptcy case pending when FinancialWeb was founded.

Exceptions to discharge are construed strictly against creditors and liberally in favor of honest debtors. In re St. Laurent, 991 F.2d 672, 680 (11th Cir. 1993).  Bankruptcy Code Section 523(a)(19) excepts from discharge any debt arising from the violation of federal or state securities laws, or for common law fraud, deceit, or manipulation in connection with the purchase or sale of any security. In re Kilroy, 354 B.R. 476, 488 (Bankr.S.D.Tex.2006). Section 523(a)(19) "was designed to close a 'loophole' which allowed debtors convicted of securities fraud or other securities violations to discharge the debt owed to their victims." In re Presto, 376 B.R. 554, 592 (Bankr.S.D.Tex.2007) (citing Gibbons, 289 B.R. 588, 592 (Bankr.S.D.N.Y. 2003) (other citations omitted)). Plaintiffs must prove each and every element of their case by a preponderance of the evidence. In re Tognetti, 2007 WL 1080147, *2 (Bankr.S.D.N.Y.2007) (quoting In re Flaherty, 335 B.R. 481, 489 (Bankr.D.Mass.2005) (citing Grogan v. Garner, 498 U.S. 279, 286 (1991))).

Section 523(a)(19) discharge exceptions are often defined by law external to the Bankruptcy Code.   In re Chan, 355 B.R. 494, 503 (Bankr.E.D.Pa.2006) ("[T]he § 523(a)(19) discharge exception is defined, at least in part, in terms of claims established under specified

---

[23]  The plaintiffs' adversary complaint initially sought relief under Section 523(a)(2)(A) as well as Section 523(a)(19), but plaintiffs withdrew the Section 523(a)(2)(A) count. (Doc. No. 118, p. 2, Plaintiffs' Trial Memorandum). Additionally, plaintiffs attached the Amended Complaint filed in the Broward Case as Exhibit A to the adversary complaint against Lichtman and incorporated the allegations therein by reference, but dropped the charges under Count III of the Amended Complaint, which alleged violations of Florida Civil Remedies for Criminal Practices Act. ("Plaintiffs concede that the Florida RICO claim is not within the scope of § 523(a)(19).").

non-bankruptcy statutes.").[24] In this adversary proceeding, the plaintiffs assert two claims against Lichtman arising under Florida state law that they argue give rise to nondischargeable debts pursuant to Section 523(a)(19)—one for common law fraud (Count I) and one for negligent misrepresentation (Count II).

Common law fraud and negligent misrepresentation involve more or less the same elements of proof:  (i) a false statement of fact; (ii) made for the purpose of inducing another to act in reliance thereon; (iii) action by the other person in reliance on the correctness of the statement; and (iv) resulting damage to the other person. Gandy v. Trans World Computer Technology Group, 787 So.2d 116, 118 (Fla. 2d Dist. Ct. App. 2001) (citing Mettler, Inc. v. Ellen Tracy, Inc., 648 So.2d 253 (Fla. 2d Dist. Ct. App. 1994)); Hasenfus v. Secord, 962 F.2d 1556 (11th Cir. 1992). The only slight difference between proving common law fraud and negligent misrepresentation[25] is that in common law fraud a plaintiff must show that the defendant made a false statement that the defendant knew to be false, whereas with negligent misrepresentation a plaintiff need only show that the defendant failed to ascertain the truth or falsity of his or her representation.  Hasenfus v. Secord, 962 F.2d 1556, 1561 (11th Cir. 1992) (citing Emerson Electric Co. v. Farmer, 427 F.2d 1082, 1087-88 (5th Cir. 1970) (applying Florida law)). "If a plaintiff claims to be misled, but cannot demonstrate a causal connection between the defendant's conduct and the plaintiff's misapprehension, the plaintiff cannot recover." Humana, Inc. v. Castillo, 728 So.2d 261, 265 (Fla. 2d Dist. Ct. App. 1999);  City Bank & Trust Co. v. Vann (In re Vann), 67 F.3d 277, 280 (11th Cir. 1995) (ruling,  in connection with a case under Section 523(a)(2), that a creditor cannot establish non-dischargeability without

---

[24] At least one court has held that state and federal courts have concurrent jurisdiction to hear claims and to determine dischargeability under Section 523(a)(19). In re Chan, 355 B.R. 494, 503 (Bankr.E.D.Pa.2006) (citing, e.g., In re Otto, 311 B.R. 43, 46 (Bankr. E.D. P.A. 2004)).

[25] Because of the similarities of proof needed for both actual fraud and negligent misrepresentations, the Court will address both claims; however, the Court reserves ruling on whether negligent, as opposed to intentional, misrepresentations can ever state a claim for non-dischargeability under Section 523(a)(19).  Typically, dischargeability of a debt is denied only where the debtor commits a knowing and intentional bad act, i.e., an intentional tort. Kawaauhau v. Geiger, 523 U.S. 57 (1998).

proof of reliance on misrepresentations by the debtor).  The reliance upon the debtor's false representation must be justified.  <u>Field v. Mans</u>, 516 U.S. 59, 73-75 (1995).

Here, the plaintiffs' entire case is based on what Lichtman allegedly omitted, or failed to disclose, to the plaintiffs at the January 1999 meeting, in later discussions, or in the companies' subsequent SEC filings.[26] They argue that, had such disclosures been made, they would not have purchased, or, in Katsock's case, recommended the purchase of, FinancialWeb shares.

The plaintiffs, however, did not plead a count of fraudulent concealment.  Fraudulent concealment, which is very similar to actual fraud, allows a plaintiff to recover if the defendant intentionally suppresses material facts. Otherwise, the elements of fraudulent concealment are the same as the elements of common law fraud and negligent misrepresentation, and include: "(1) a misrepresentation of material fact **or suppression of the truth**; (2) [a] knowledge of the representor of the misrepresentation, or [b] representations made by the representor without knowledge as to either the truth or falsity, or [c] representations made under circumstances in which the representor ought to have known, if he did not know, of the falsity thereof; (3) an intention that the representor induce another to act on it; and (4) resulting injury to the party acting in justifiable reliance on the representation." <u>Greenberg v. Miami Children's Hospital Research Institute, Inc.</u>, 264 F.Supp.2d 1064, 1073 (S.D.Fla.2003) (<u>citing</u> <u>Jones v. General Motors Corp.</u>, 24 F.Supp.2d 1335, 1339 (M.D.Fla.1998) (internal citation omitted) (emphasis added).

Like common law fraud and negligent misrepresentation, Florida law also "imposes a reliance requirement in an omissions case" <u>Humana</u>, 728 So.2d at 265 (<u>citing</u> <u>Morgan v. Canaveral Port Authority</u>, 202 So.2d 884 (Fla. 4th Dist. Ct. App. 1967)), and "requires a party asserting fraud to establish that, but for the alleged misrepresentation or nondisclosure, the party

---

[26] The plaintiffs acknowledge that their case is based on omissions, or on suppression of material facts, rather than on any affirmative misstatement.  (Doc. No. 118, plaintiffs' trial memorandum, p. 5) ("[t]his case primarily concerns omissions, rather than affirmative misrepresentations").

would not have entered the transaction." <u>Humana</u>, 728 So.2d at 265 (<u>citing</u> <u>Great American Ins.</u> <u>Co. v. Suarez</u>, 92 Fla. 24, 109 So. 299 (Fla.1926); <u>Atlantic Nat'l Bank v. Vest</u>, 480 So.2d 1328 (Fla. 2d Dist Ct. App. 1985); <u>Billian v. Mobil Corp.</u>, 710 So.2d 984 (Fla. 4th Dist. Ct. App. 1998); <u>Hauben v. Harmon</u>, 605 F.2d 920 (5th Cir.1979)).  Although not specifically pled, the Court will treat the plaintiffs' allegations to include the nuance of a fraudulent concealment claim, insofar as their allegations really assert that Lichtman personally omitted to disclose material facts relating to Cabasso's status with FinancialWeb, Cabasso's criminal background, and Cabasso's pending bankruptcy case.

After the extensive factual findings and the somewhat protracted explanation of the legal standard, the final analysis is straightforward.  The plaintiffs have failed to prove common law fraud, negligent misrepresentation, or fraudulent concealment.  All three alleged causes of action require that the defendant make or omit a material statement of fact.  Here, the plaintiffs have failed to prove this critical element.

Lichtman never misrepresented or failed to explain Cabasso's role as a promoter, founder, or control person of FinancialWeb.  The Court finds Katsock's testimony incredible that he was ignorant of Cabasso's relationship with the company at the time he purchased or recommended the purchase of FinancialWeb shares.  Rather, the Court specifically finds that Lichtman fully disclosed to Katsock the existence of the Oral Agreement, Cabasso's role as founder/control person of FinancialWeb, and Cabasso's equity interests as early as January 1999, when Lichtman initially met Katsock.  Moreover, Lichtman could not disclose Cabasso's criminal/bankruptcy history because Lichtman himself did not learn of this historical information until *after* he was ousted from the company in October 1999.  Lichtman certainly cannot suppress the truth of information he did not know.

The plaintiffs have failed to prove that Lichtman made any false statement or in any way suppressed any material fact. Because no misrepresentation/omission occurred, the plaintiffs also necessarily have failed to prove that the non-existent statements/omission were made to induce reliance by the plaintiffs, that they relied on any such statements/omission, or that their damages arose from Lichtman's actions.  The plaintiffs certainly have suffered substantial losses due to their purchase of FinancialWeb stock; however, the losses are not attributable to any bad act, misrepresentation, or omission of Lichtman.  The debtor owes them no damages, and any alleged debt is dischargeable.

Accordingly, plaintiffs' claims are *not* excepted from discharge pursuant to Bankruptcy Code Section 523(a)(19). A separate Final Judgment in favor of the debtor and consistent with this Memorandum Opinion shall be entered simultaneously herewith.

DONE AND ORDERED on March 14, 2008.

_____
KAREN S. JENNEMANN
United States Bankruptcy Judge


Copies provided to:

Pro Se Debtor/Defendant:  Kevin Alan Lichtman, 908 Woodbriar Loop, Sanford, FL  32771

Plaintiffs' Counsel:  Matthew E. Miller, Law Offices of Matthew E. Miller, 1010 Vermont Avenue Northwest, Suite 218, Washington, D.C.  20005

Plaintiffs' Counsel:  Michael K. Spotts, Michael K. Spotts Law Offices PA, 300 Colorado Avenue, Suite 203, Stuart, FL 34994